THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| CHRISTOPHER LARSON and ANGELA LARSON, | No. 80968-7-I |
| Appellants, | DIVISION ONE |
| v. | PUBLISHED OPINION |
| SNOHOMISH COUNTY, a Washington State Municipal Corporation; CAROLYN WEIKEL, individually and as the SNOHOMISH COUNTY AUDITOR and Registrar; SONJA KRASKI, individually and as the SNOHOMISH COUNTY CLERK; JANE DOE, individually and as SNOHOMISH COUNTY EXAMINER OF TITLES and LEGAL ADVISOR TO THE REGISTRAR; SNOHOMISH COUNTY SUPERIOR COURT JUDGES GEORGE F. APPEL, GEORGE N. BOWDEN, MARYBETH DINGLEDY, JANICE E. ELLIS, ELLEN J. FAIR, ANITA L. FARRIS, MILLIE M. JUDGE, LINDA C. KRESE, DAVID A. KURTZ, JENNIFER R. LANGBEHN, CINDY A. LARSEN, ERIC Z. LUCAS, RICHARD T. OKRENT, BRUCE J. WEISS, and JOSEPH P. WILSON; THE STATE OF WASHINGTON; WASHINGTON STATE GOVERNOR JAY INSLEE in his official capacity; WASHINGTON STATE ATTORNEY GENERAL ROBERT FERGUSON in his official capacity as WASHINGTON ATTORNEY GENERAL; JOHN DOES, Successors in interest and assigns to | |

| | |
|---|---|
| NEW CENTURY MORTGAGE COMPANY and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; DEUTSCHE BANK NATIONAL TRUST COMPANY; DEUTSCHE BANK NATIONAL TRUST COMPANY as trustee for Morgan Stanley ABS Capital I Inc. Trust 2007-HE2 Mortgage Pass Through Certificates, Series 2007; MORGAN STANLEY ABS CAPITAL I INC. TRUST 2007-HE2; QUALITY LOAN SERVICE CORPORATION OF WASHINGTON, a Washington Corporation; SELECT PORTFOLIO SERVICING, INC., a Utah corporation; and MORTGAGE ELECTRONIC RECORDING SYSTEM, INC., a Delaware Corporation, <br><br> Respondents. | |
| CHRISTOPHER LARSON and ANGELA LARSON, <br><br> Appellants, <br><br> v. <br><br> NEW CENTURY MORTGAGE; JANE DOE; ALL OTHER PERSONS OR PARTIES UNKNOWN CLAIMING ANY RIGHT, TITLE, ESTATE, LIEN OR INTEREST INTO, OR UPON THE REAL PROPERTY DESCRIBED HEREIN, <br><br> Respondents. | No. 81874-1-I |

ANDRUS, A.C.J. — Christopher and Angela Larson appeal adverse rulings in two separate lawsuits related to the nonjudicial foreclosure of their home. They challenge the dismissal of a Torrens Act[1] application they filed in Snohomish County Superior Court[2] and the dismissal of a lawsuit they filed in Skagit County

---

[1] Ch. 65.12 RCW.

[2] The Snohomish County Torrens Act application was filed as Snohomish County Superior Court No. 18-2-04994-31. We will refer to this lawsuit hereinafter as the "Torrens Act proceeding."

Superior Court against the State of Washington, Snohomish County, its superior court judges, the successor lender, foreclosure trustee, and loan servicer.[3]

In both proceedings, the Larsons sought a judicial determination that the 2006 deed of trust they granted to their initial lender, New Century Mortgage Company, was invalid. In the Skagit County lawsuit, the Larsons sought declaratory relief against the Public Defendants,[4] seeking to compel them to comply with the Torrens Act. They also sought monetary damages and injunctive relief against the successor lender, the trustee, and loan servicer[5] for alleged violations of the Deed of Trust Act (DTA)[6] and the Consumer Protection Act (CPA).[7]

Although the Larsons sought injunctive relief, they never actually moved to enjoin the nonjudicial foreclosure sale. The trustee proceeded with the sale after which the trial court dismissed the Larsons' claims against the Public Defendants under CR 12(b)(6) and transferred venue for the remaining claims against the Private Defendants to Snohomish County Superior Court. The court subsequently dismissed all remaining claims on summary judgment. The court also dismissed the Larsons' Torrens Act application because they were no longer title owners of the property.

---

[3] The Skagit County lawsuit was filed under Skagit County Superior Court No. 18-2-01234-29. The court transferred venue of the lawsuit to Snohomish County Superior Court in January 2019, and it proceeded under Snohomish County Superior Court No. 19-2-01383-31.

[4] We refer hereafter to the State of Washington, Governor Inslee, and Attorney General Ferguson collectively as "the State Defendants." We refer to Snohomish County, its auditor, its examiner of titles, and the Snohomish County superior court judges as "the County Defendants." We refer to the State Defendants and the County Defendants collectively as "the Public Defendants."

[5] We refer hereafter to Deutsche Bank Trust Company, as trustee for Morgan Stanley ABS Capital I, Inc. Trust 2007-HE2, Quality Loan Service Corporation of Washington, Select Portfolio Servicing, Inc. and Mortgage Electronic Recording System (MERS) collectively as "the Private Defendants."

[6] Ch. 61.24 RCW.

[7] Ch. 19.86 RCW.

On appeal, the Larsons raise a number of statutory and constitutional arguments, none of which have merit. We therefore affirm the dismissal of both lawsuits.

FACTUAL BACKGROUND

In October 2006, Christopher Larson[8] purchased a house in Snohomish County and borrowed $218,000 from New Century Mortgage Corp. (New Century) to do so. Christopher signed the promissory note in which he agreed to make monthly loan payments beginning December 1, 2006. Christopher and his wife, Angela, executed a deed of trust securing the loan. The deed of trust identified Christopher as the borrower, New Century as the lender, First American Title as the trustee, and Mortgage Electronic Registration Systems, Inc. (MERS) as the beneficiary. The sellers, Tyson and Alisia Bushnell, executed a statutory warranty deed, conveying the property to Christopher, on October 9, 2006.

The Larsons allege that New Century declared bankruptcy in April 2007 and declined to accept their mortgage payment in August 2007. Angela testified that she contacted New Century and was informed that the lender no longer "had [their] mortgage" and could not tell her to whom they should pay their mortgage payment. In October 2007, the Larsons received a notice of default on behalf of Countrywide Home Loans through its servicer, Recontrust. The Larsons, believing their home was in foreclosure, moved to Idaho, where they lived for eight years.

The Larsons do not dispute that they made no regular mortgage payments after July 2007. In 2009, they received another notice of default from BAC Home

---

[8] We refer to Christopher and Angela Larson by their first names for ease of reference. We mean no disrespect in doing so.

Loans and in 2010, they received both a notice of default and a notice of trustee sale from Recontrust on behalf of Bank of America. The Larsons did not respond to any of these notices and made no loan payments in response to them.

In July 2010, MERS assigned its interest in the Larson deed of trust to Deutsche Bank, the note holder at the time. That same month, Recontrust issued a notice of trustee sale, identifying Deutsche Bank as the assignee under the deed of trust, but it apparently did not proceed with the sale.

In August 2012, the Larsons received a letter from Select Portfolio Servicing, Inc. (SPS), identifying itself as the new loan servicer. In May 2014, SPS referred the account to a new trustee, Northwest Trustee Services, Inc., to commence foreclosure. At that point, the Larsons retained counsel who began corresponding with Northwest Trustee Services and SPS, challenging the validity of the debt and the right of any lender to conduct a nonjudicial foreclosure sale. The Larsons made no payments on the note until May 2017, when they made one partial mortgage payment.

On December 22, 2017, North Cascade Trustee Services, Inc., the successor trustee, issued a notice of default on behalf of the note holder, Deutsche Bank. North Cascade recorded a notice of trustee's sale in February 2018 and set a sale date of June 29, 2018.

On May 17, 2018, SPS appointed Quality Loan Service Corporation of Washington (QLS) as successor trustee under the deed of trust.

On June 5, 2018, the Larsons filed an "Application for 'Torrens' Registration of Title to Land" in Snohomish County Superior Court. In this application, the Larsons alleged that "[t]here a[re] no known valid liens or encumbrances on the

listed property," and sought a court order declaring that they held sole title to their land. The Larsons attached to their application a copy of a Ticor Title Company commitment for title insurance, with an effective date of June 9, 2017. This commitment, by its terms, was no longer in effect, as it had expired six months after its effective date. The commitment also identified as an encumbrance, and excluded from any title insurance coverage, the recorded Deutsche Bank deed of trust.

The next day, on June 6, 2018, QLS executed a notice of discontinuance of the trustee sale scheduled for June 28, 2018, and issued a new notice of trustee's sale, rescheduling the foreclosure sale for October 12, 2018. The notice was recorded on June 8, 2018. There is no evidence in the record that Deutsche Bank, QLS, or SPS was aware of the Larsons' Torrens Act application before issuing this notice of trustee sale. At some point, QLS continued the foreclosure sale to November 16, 2018.

The Larsons did not move to enjoin the foreclosure sale. Nor did they file a motion in the Torrens Act proceeding to obtain any relief under that statute. Instead, on October 18, 2018, they initiated a lawsuit in Skagit County Superior Court against the Public and Private Defendants, alleging several causes of action. The Larsons sought declaratory and injunctive relief against the Public Defendants, seeking an order compelling the County Defendants to create a Torrens Act system, compelling the superior court judges to comply with their duties under the Torrens Act, compelling the State Attorney General to "provide guidance to the court" on how to comply with the Torrens Act, and compelling the Governor to fulfill his duty to "see that the laws are faithfully executed."

The Larsons alleged that they wanted to register their interest in the land under the Torrens Act, but if they could not do so, they alternatively sought to quiet title, alleging that the original promissory note had been forged, that the original loan had never been funded, that Deutsche Bank had no interest in the property under the deed of trust, and that foreclosure was barred by the statute of limitations.

They also sought damages and injunctive relief against Deutsche Bank, MERS, SPS, and QLS under the CPA. They claimed that these Private Defendants violated the CPA by attempting to collect a "loan which was never funded," "[i]ntentionally splitting the note from the Security Instrument and transferring each separately," falsifying or forging a note, charging fees not owed, and violating the DTA by attempting to foreclose on a void note and deed of trust after the expiration of the statute of limitations. They further alleged that the DTA was unconstitutional on its face and as applied to them.[9] Finally, they alleged numerous but unspecified "equitable claims" to preclude Deutsche Bank from foreclosing on their home.

When the Larsons did not obtain a court order precluding Deutsche Bank and QLS from conducting the scheduled nonjudicial foreclosure sale, QLS sold the Larsons' property to Deutsche Bank on November 16, 2018, and recorded the trustee deed of sale on November 21, 2018.

---

[9] The Larsons also alleged claims under the Washington Collection Agency Act, Ch. 19.16 RCW, the Consumer Loan Act, Ch. 31.04 RCW, and 42 U.S.C. §1983. The Larsons do not challenge the dismissal of these claims.

On November 30, 2018, the Public Defendants moved to dismiss the Larsons' claims against them, arguing that the Larsons' Torrens Act application was deficient due to their failure to file an abstract of title as required by RCW 65.12.085, and, in the alternative, moved to transfer venue to Snohomish County Superior Court under RCW 4.12.010(1) and RCW 4.12.020(2).

QLS moved to dismiss the claims asserted against it, arguing the DTA is constitutional, the Larsons waived any claims by failing to seek an injunction of the sale before it occurred, Deutsche Bank was the holder of the Larson promissory note and entitled to foreclose, the foreclosure sale complied with the DTA, and the statute of limitations did not bar foreclosure. QLS also joined in the Public Defendants' motions. Deutsche Bank, SPS and MERS joined the motions filed by the Public Defendants and QLS.

At a December 2018 hearing on these motions, the Larsons asked Skagit County Superior Court Judge Svaren to recuse himself, a request the court denied. The court granted the Public Defendants' motions and dismissed all claims against them without prejudice. The court separately granted the Private Defendants' motion to dismiss with prejudice the Larsons' quiet title claim, concluding that the Larsons' failure to enjoin the trustee sale under RCW 61.24.127(2) barred that claim. The court denied the motion to dismiss the CPA claim, the claim for declaratory relief as to the constitutionality of the DTA, and the Larsons' claim for "equitable causes of action." The court concluded venue in Snohomish County was mandatory under RCW 4.12.020(1) and transferred all remaining claims to Snohomish County Superior Court.

In July and August 2019, the Private Defendants moved for summary judgment dismissal of all remaining claims. While the parties were briefing these summary judgment motions, the Larsons moved to amend their complaint to add new causes of action against the Private Defendants and to add as defendants the Washington State Treasurer, the Washington State Investment Board, the Snohomish County Treasurer, Snohomish County Prosecuting Attorney, and Snohomish County Sheriff. They simultaneously moved to disqualify all Snohomish County judicial officers on the grounds that they were named as defendants to the action. The presiding judge of Snohomish County Superior Court granted the motion to disqualify the named judges and assigned the case to Judge Svaren, sitting in the capacity of a visiting judge for Snohomish County Superior Court.

Judge Svaren heard oral argument on the Larsons' motion to amend their complaint on October 23, 2019. The court denied the motion in part, concluding that the proposed amended complaint realleged a claim for quiet title, a claim the court had already dismissed with prejudice, and realleged violations of the Torrens Act, claims the court had dismissed for lack of compliance with that statute. The Larsons reminded the court that it had dismissed the Torrens Act claims without prejudice. The court responded "It does not make any difference to the court, because as I said, the basis of that ruling remains the same. There was no abstract filed. [The] Torrens Act was not properly invoked and therefore there's no judiciable controversy."[10]

---

[10] The court granted the motion to the extent the Larsons sought to assert their "undefined equitable claims," and the CPA claim. It also ruled that the Larsons could proceed with their constitutional

- 9 -

Despite this ruling, on October 24, 2019, without notice to any of the other parties, the Larsons appeared in the Ex Parte Department of the Snohomish County Superior Court and presented a motion to a commissioner for an order referring their Torrens Act application to the county examiner of titles. They attached to this motion the same expired Ticor Title Company commitment for title insurance as they had previously attached to their June 2018 application, and represented to the commissioner that this document was an "abstract of title," despite the fact that Judge Svaren had ruled that the document did not constitute an abstract of title under the Torrens Act. The commissioner signed an order referring the Larsons' application to the county examiner of titles.[11]

On November 11, 2019, the court granted the Private Defendants' summary judgment motions.

On May 29, 2020, Deutsche Bank, now the sole owner of the property, filed a motion to dismiss the Larsons' Torrens Act application and the case was assigned to Judge Okrent at Snohomish County Superior Court. The Larsons moved for Judge Okrent to recuse himself, but the court denied the motion. At an August 19, 2020, hearing, the court dismissed the Larsons' Torrens Act case, concluding that they were no longer owners of the property and had no right to seek a title registration under the Torrens Act.

The Larsons now appeal rulings from both cases.

---

challenge to the DTA. It asked the Larsons to submit a new proposed amended complaint that complied with the court's ruling as to the claims it would allow and those it would not. We have been unable to locate any revised amended complaint in the record before us.

[11] The County Defendants moved to vacate this ruling based on the Larsons' misrepresentations to the commissioner, but subsequently withdrew that motion when Deutsche Bank moved to dismiss the application.

## ANALYSIS

1. The Deeds of Trust Act and the Torrens Act

At the heart of this case is a question of the relationship between two statutes, the well-known Deeds of Trust Act (DTA), chapter 61.24 RCW, and the lesser-known and rarely used Torrens Act, chapter 65.12 RCW. The Larsons contend that they had the statutory right to initiate a Torrens Act proceeding to register title to their land and to clear any cloud to that title, including obtaining a judicial determination as to the validity of the Deutsche Bank deed of trust. They argue that simply filing the Torrens Act proceeding had the legal effect of staying any nonjudicial foreclosure sale—even in the absence of a court order enjoining the sale—and that the Public Defendants denied them the right to this proceeding by not having a functioning Torrens Act system. They further argue that Deutsche Bank and the trustee violated the DTA by proceeding with the nonjudicial foreclosure sale once the Larsons filed their Torrens Act petition.

To analyze their claims, we need to understand the difference between the DTA and the Torrens Act. Most homeowners have a basic understanding of a mortgage. "A mortgage [is] a mechanism to secure an obligation to repay a debt," and has existed since "at least the 14th century." Bain v. Metro. Mortg. Grp., Inc., 175 Wn.2d 83, 92, 285 P.3d 34 (2012). Most mortgages today are secured by a deed of trust on the property. Id. Under the DTA, a deed of trust creates a three-party transaction in which the borrower conveys their property to a trustee who holds in trust for the lender, who is the beneficiary of this transaction. Id.

Under the DTA, if the deed of trust explicitly provides the trustee with the power of sale on a default of the underlying loan, the trustee may foreclose the

deed of trust and sell the property without judicial supervision, i.e., through a nonjudicial foreclosure sale. Id. at 93 (citing RCW 61.24.020, RCW 61.12.090, and RCW 7.28.230(1)). Because the power to sell is "a significant power," the DTA sets out specific procedures a trustee must follow before it may legally conduct such a sale. Id.

In interpreting the DTA, our Supreme Court has advised courts to keep in mind the statute's three basic objectives: the nonjudicial foreclosure process should remain efficient and inexpensive, the process should provide an adequate opportunity for interested parties to prevent wrongful foreclosure, and the process should promote the stability of land titles. Id. at 94; accord Jackson v. Quality Loan Serv. Corp., 186 Wn. App. 838, 848, 347 P.3d 487 (2015).

While the DTA governs the use of deeds of trust to secure home loans and the process by which lenders may enforce their rights against borrowers who default on those loans, the Torrens Act has nothing to do with the securitization of residential mortgages or the enforcement of rights under deeds of trust. The Torrens Act is instead one of two recognized methods of establishing who holds legal title to a piece of real estate.

Under RCW 65.04.020(1), each county auditor must have a system of recording transfers of real property. The auditor, acting as the "register of deeds," maintains actual books containing copies of all instruments affecting title to parcels of land within the county. 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: TRANSACTIONS § 14.6 (2d ed. 2004). An auditor must record documents if certain requisites are met. Id. The auditor maintains a general index of all recorded documents. Id. (citing RCW 65.04.050).

This recording system does not determine the validity of any deed or encumbrance; it instead merely provides notice, and establishes priority of, recorded legal interests in the land. Id. at § 14.5; see also Dickson v. Kates, 132 Wn. App. 724, 737, 133 P.3d 498 (2006) ("our recording statutes are intended to provide constructive notice to land possessors who have restrictions burdening their land"). Recording a deed or other conveyance document with a county auditor is not required by law, but is, instead, permissive. Id. (citing RCW 65.08.070). Once an encumbrance is recorded, a subsequent purchaser is deemed to have constructive notice of it, but anyone searching the county land index has a right to rely on it and is not bound to search for records outside the recorded chain of title. Dickson, 132 Wn. App. at 737.

Because recording a deed or some other encumbrance does not establish its legal validity, chain-of-title issues can arise. 18 STOEBUCK & WEAVER, supra § 14.11. Such problems arise rarely in Washington because of the prevalence of title insurance companies, who conduct title searches to identify instruments that create a cloud on one's title. Id.

The Torrens Act, unlike the recording statutes, establishes a system for adjudicating the validity of one's title and any encumbrances on land through a process called "registration." Id. at § 14.13; RCW 65.12.005. Adopted by the Washington legislature in 1907, the Torrens Act allows a landowner to apply to have their title registered by filing a petition for registration with the superior court for the county in which the land is situated. RCW 65.12.005; RCW 65.12.040. The court must then "inquire into the condition of the title to and any interest in the land and any lien or encumbrance thereon," and enter a judicial decree declaring the

- 13 -

validity of title and any liens or encumbrances on the land, declaring the priority of any such encumbrances, and removing any clouds on the title. RCW 65.12.040.

The process starts with the filing of an application and "an abstract of title" in superior court and recording the application with the county auditor. RCW 65.12.005 (recording with auditor required); RCW 65.12.040 (filing application with superior court required); RCW 65.12.085 (filing abstract of title required); 18 STOEBUCK & WEAVER, supra §14.14. The clerk must certify a copy of the application and file it with the auditor, at which time the application has "the force and effect of a lis pendens." RCW 65.12.100.

When the abstract of title is on file, the superior court "shall enter an order referring the application to an examiner of titles." RCW 65.12.110. The title examiner examines the abstract of title, searches records, "investigate[s] all the facts brought to his or her notice," and then issues a report containing his or her opinion on the title. If the opinion is adverse to the applicant, they may withdraw the application or proceed with further judicial proceedings. Id. Summonses are issued to any person found by the examiner as being in possession of the property or having a lien, encumbrance, or any other right, title or interest in the land. RCW 65.12.120, RCW 65.12.130.

Once summonses have issued and those served have appeared and answered, the superior court may decide the case or may refer the matter to the title examiner to take evidence and report their findings to the court. RCW 65.12.160. RCW 65.12.165. If the court determines the applicant holds title to the land, it may issue a decree of confirmation and registration. RCW 65.12.175. This decree becomes binding and conclusive as against all other parties to the action.

Id. And the person receiving the certificate of title holds that title "free from all [e]ncumbrances except only such estates, mortgages, liens, charges and interests" noted in the last certificate of title in the registrar's office. RCW 65.12.195.

The Torrens Act has been "little used" since its adoption, the primary reason being

> the trouble and expense of converting from recorded to registered title. Since all land was under record title when the Torrens system was adopted and since the certificate of registration is, with a few exceptions, conclusive as to the state of title, it is necessary to have a kind of quiet title action in court to establish the title and other interests that will appear on the original [title] certificate.

18 STOEBUCK & WEAVER, supra, § 14.13 at 161.

2. Larsons' Torrens Act Claims Against Public Defendants

The Larsons first contend the trial court erred in dismissing their declaratory judgment action against the Public Defendants because it lacked subject matter jurisdiction over the adequacy of their Torrens Act application. The Larsons also contend their Torrens Act application was not defective because the Ticor Title Insurance document they submitted to the court was the equivalent of an abstract of title as that term is used in RCW 65.12.085.

We review de novo a dismissal under CR 12(b)(6). Leishman v. Ogden Murphy Wallace, PLLC, 196 Wn.2d 898, 903, 479 P.3d 688 (2021). A dismissal at this stage of the proceedings will be affirmed if it appears beyond doubt that the plaintiff can prove no set of facts consistent with the complaint that would entitle him or her to relief. Id. at 903-04.

- 15 -

The Larsons' subject matter argument lacks merit. A superior court has subject matter jurisdiction "where it has authority to adjudicate the type of controversy involved in the action." Boudreaux v. Weyerhaeuser Co., 10 Wn. App. 2d 289, 295, 448 P.3d 121 (2019) (quoting In re Marriage of McDermott, 175 Wn. App. 467, 480-81, 307 P.3d 717 (2013)). The Washington Constitution provides that "The superior court shall also have original jurisdiction in all cases and of all proceedings in which jurisdiction shall not have been by law vested exclusively in some other court." CONST. art. IV, § 6.

The Larsons do not argue that any of their claims against the Public Defendants have been vested in the exclusive jurisdiction of another forum. Instead, they argue that Skagit County Superior Court lacked jurisdiction under the "prior exclusive jurisdiction doctrine," which, they assert, stands for the proposition "that two courts do not have the jurisdiction to adjudicate the same case at the same time." The Larsons argue that under the doctrine, Skagit County Superior Court's 2018 ruling that their Torrens Act application was defective conflicts with the Snohomish Superior Court's 2019 order accepting the application and referring it to the county examiner of titles.

No Washington court has ever held that the prior exclusive jurisdiction doctrine applies in this state. The Larsons' position is puzzling because they themselves invoked the Skagit County Superior Court's jurisdiction by filing this lawsuit in that court and seeking relief for Snohomish County's alleged inaction with regards to their Torrens Act application. The Larsons sought a court order requiring the Snohomish County Superior Court to process their Torrens Act application; the County Defendants argued they had no duty to do so because the

Larsons failed to file a valid application under the statute. Because the defense to the Larsons' claims against the County Defendants was the invalidity of their application and the Larsons invoked the subject matter jurisdiction of the superior court, the Skagit County Superior Court had the authority to render a ruling on whether the Larsons complied with RCW 65.12.085.

The Larsons also argue that Skagit County Superior Court lacked jurisdiction under the "priority of action rule." This argument fails for similar reasons. "The rule provides generally that the first court to obtain jurisdiction over a case possesses exclusive jurisdiction to the exclusion of other coordinate courts." Am. Mobile Homes of Wash., Inc. v. Seattle-First Nat'l Bank, 115 Wn.2d 307, 317, 796 P.2d 1276 (1990). "[T]he rule should not be automatically applied each time two similar cases are pending in different counties. For instance . . . there must be identity of subject matter, relief, and parties between the actions before the priority rule should be applied." Id.

The Larsons chose to sue the Public Defendants in Skagit County Superior Court. They cite no authority for the proposition that, because they filed a Torrens Act application in Snohomish County Superior Court, this act divested Skagit County Superior Court of the jurisdiction to rule on a case properly before it under the elective venue statute, RCW 36.01.050(1). These are two different cases. The issue the Larsons presented before Skagit County Superior Court was whether they were entitled to an injunction requiring Snohomish County to take action under the Torrens Act. Any issues with Skagit County Superior Court's jurisdiction were rendered moot when the Skagit County Superior Court transferred venue to Snohomish County Superior Court, the court the Larsons now claim should have

- 17 -

ruled on the adequacy of their Torrens Act application in the first instance. We reject the Larsons' subject matter jurisdiction argument.

As to the merits of the dismissal, the Larsons' claims against the Public Defendants rested on the allegation that Snohomish County failed to follow the mandatory procedures laid out in the Torrens Act with regard to their land title application. The Larsons alleged that they filed their application in court on June 5, 2018, that the clerk did not file the application in the "land registration docket," and that the superior court did not refer the application to a county title examiner as required under the statute. The trial court dismissed this claim without prejudice, concluding that the Larsons' application did not trigger the County's duties under the Act because the application did not include the required abstract of title. We affirm this ruling.

The Larsons argued below that their application was not defective because there is a question of fact as to whether their title insurance commitment constitutes an "abstract of title" under the Torrens Act. But the meaning of RCW 65.12.085 is a question of law, not a question of fact, and we review the trial court's interpretation de novo. Dept. of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9, 43 P.3d 4 (2002).

RCW 65.12.085 requires the filing of "an abstract of title such as is now commonly used." Commentators have stated, "[n]ow that abstracts of title are no longer 'commonly used' in Washington, it is unclear whether an old-fashioned abstract must be produced, if anyone can be found to make up one, or whether a preliminary commitment for title insurance . . . will suffice." 18 STOEBUCK &

WEAVER, supra, § 14.14 at 163. We conclude a preliminary commitment for title insurance does not suffice under the Torrens Act.

First, although the Torrens Act does not define "abstract of title," our legislature has passed statutes distinguishing between an abstract of title, a title policy, a preliminary title report, and a commitment for title insurance. Barstad v. Stewart Title Guar. Co., Inc., 145 Wn.2d 528, 537, 39 P.3d 984 (2002). In the chapter regulating title insurers, chapter 48.29 RCW, the legislature defined an abstract of title as follows:

> [A] written representation, provided under contract, whether written or oral, intended to be relied upon by the person who has contracted for the receipt of this representation, listing all recorded conveyances, instruments, or documents that, under the laws of the state of Washington, impart constructive notice with respect to the chain of title to the real property described. An abstract of title is not a title policy as defined in this subsection.

RW 48.29.010(3)(a). A title insurance commitment serves a very different purpose:

> "Preliminary report," "commitment," or "binder" means reports furnished in connection with an application for title insurance and are offers to issue a title policy subject to the stated exceptions in the reports, the conditions and stipulations of the report and the issued policy, and other matters as may be incorporated by reference. The reports are not abstracts of title, nor are any of the rights, duties, or responsibilities applicable to the preparation and issuance of an abstract of title applicable to the issuance of any report. The report is not a representation as to the condition of the title to real property, but is a statement of terms and conditions upon which the issuer is willing to issue its title policy, if the offer is accepted.

RCW 48.29.010(3)(f). Requiring a Torrens Act applicant to file and record an abstract of title serves the purpose for which this requirement is intended: it provides the title examiner a report as to the condition of the title to real property.

Allowing the applicant to file a title insurance commitment would not serve this purpose because a commitment makes no representations as to chain of title.

Second, even if a title insurance policy could serve the same purpose as an abstract of title, the Larsons' Ticor Title commitment expired a year before they filed it. An expired title insurance commitment clearly cannot meet the purpose of an abstract of title under RCW 65.12.085. The trial court correctly concluded that the County Defendants had no duty to process the Larsons' Torrens Act application in the absence of the statutorily mandated abstract of title.

The Larsons now argue that they should have had the opportunity to amend their Torrens Act application and file the requisite abstract of title. But they had this opportunity; the trial court's dismissal was without prejudice. The Larsons could have remedied the defect in their Torrens Act application by obtaining, filing, and recording a current abstract of title and, if the County then failed to act, could have renewed its claim for injunctive relief. And the Larsons also had time to move to enjoin the nonjudicial foreclosure sale to give them time to remedy the defect. At the time they sought Torrens Act relief in June 2018, the foreclosure sale was four months away and then continued another month. They inexplicably chose not to take advantage of these options. Dismissal without prejudice was appropriate.

As to the claims against the State Defendants, the trial court correctly concluded that they have neither the duty nor the authority to force the County or its superior court judges to take the action the Larsons demanded and such an order would constitute a violation of the doctrine of separation of powers.

The Constitution provides that "[t]he attorney general shall be the legal adviser of the state officers, and shall perform such other duties as may be

prescribed by law." CONST. ART. III, § 21. The legislature has delineated the Attorney General's "other duties" in various statutes,[12] but none establish the mandatory duty the Larsons seek to enforce here. The Constitution also provides that the Governor "shall see that the laws are faithfully executed." CONST. art. III, § 5.

The Larsons argue that the Attorney General's position as "the chief law enforcement officer for Washington State" and the Governor's duty to "see that the laws are faithfully executed" imposes a duty to compel the county to develop a Torrens Act system. But neither the Attorney General nor the Governor have any duty or enforcement authority under the Torrens Act. See RCW 65.12.

The Larsons essentially seek a writ of mandamus against the State Defendants. A writ of mandamus "is an extraordinary remedy that we grant only if the mandatory act sought to be compelled is not discretionary." Goldmark v. McKenna, 172 Wn.2d 568, 576, 259 P.3d 1095 (2011). "Mandamus, therefore, is an appropriate remedy only where the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." Colvin v. Inslee, 195 Wn.2d 879, 893, 467 P.3d 953 (2020) (citations omitted). To order a mandamus to compel discretionary duties of a public official would be to "usurp the authority of the coordinate branches of government." Walker v. Munro, 124 Wn.2d 402, 410, 879 P.2d 920 (1994). Because the Larsons have not identified any mandatory duty on behalf of the Governor or Attorney General, the trial court properly dismissed the Larsons'

---

[12] See ch. RCW 43.10.

claims against the State Defendants.

We affirm the trial court's order dismissing claims relating to the Torrens Act against the Public Defendants under CR 12(b)(6).

### 3. Dismissal of Quiet Title Claim against Private Defendants

The Larsons next contend the trial court erred in dismissing their quiet title claim against the Private Defendants. They raise two main arguments. First, the Larsons argue that their June 2018 Torrens Act application precluded any nonjudicial foreclosure sale and their failure to move to enjoin the sale did not constitute a waiver of their quiet title claim. Second, they contend that RCW 64.24.127, the DTA waiver statute, is unconstitutional. We reject both arguments.

### a. A Torrens Act application does not automatically stop a nonjudicial foreclosure sale

The trial court dismissed the Larsons' quiet title claim in December 2018 because they failed to obtain an order restraining the November 2018 foreclosure sale. The trial court held that under RCW 61.24.127, the Larsons waived their quiet title claim by failing to do so. We agree.

RCW 61.24.130 provides that a borrower may seek a court order to restrain a nonjudicial foreclosure sale "on any proper legal or equitable ground." The procedure laid out in RCW 61.24.130 is "the only means by which a grantor may preclude a sale once foreclosure has begun with receipt of the notice of sale and foreclosure." Cox v. Helenius, 103 Wn.2d 383, 388, 693 P.2d 683 (1985). A borrower with notice of an impending nonjudicial foreclosure sale who does not obtain an order restraining that sale waives any claim to the validity of the sale. Plein v. Lackey, 149 Wn.2d 214, 225-26, 67 P.3d 1061 (2003).

- 22 -

RCW 61.24.127(2)(b), (d) and (e) provide that failing to enjoin a sale does not waive claims for monetary damages for certain common law and statutory claims, but "[a] borrower . . . who files such a claim is prohibited from recording a lis pendens" and "[t]he claim may not operate in any way to encumber or cloud the title to the property that was subject to the foreclosure sale." The Larsons did not obtain a court order enjoining the sale and, as a result, their quiet title action violated this provision of the DTA.

The Larsons maintain that their Torrens Act application, by itself, had the effect of preventing a nonjudicial foreclosure sale under the DTA. RCW 65.12.210, the Larsons' only authority for this proposition, provides:

> Any person who shall take by conveyance, attachment, judgment, lien or otherwise any right, title or interest in the land, <u>subsequent to the filing of a copy of the application for registration</u> in the office of the county auditor, <u>shall at once appear and answer as a party defendant in the proceeding for registration</u>, and the right, title or interest of such person shall be subject to the order or decree of the court.

(Emphasis added). This statute says nothing about whether a Torrens Act application automatically stops a nonjudicial foreclosure sale under the DTA. It merely states that if a person receives title to property after a Torrens Act application is filed, then that person must become a party defendant in the Torrens Act proceeding. RCW 65.12.210 does not support the Larsons' argument.

Nor is their argument supported by existing case law. In <u>Cox v. Helenius</u>, the Washington Supreme Court held that simply filing a lawsuit challenging the underlying debt, filed after notice of sale and foreclosure has been received, does not have the effect of restraining the sale. 103 Wn.2d at 388. In <u>Plein v. Lackey</u>, it held that simply filing an action for a permanent injunction also does not forestall

a trustee's sale that occurs before that lawsuit is resolved. 149 Wn.2d at 227. Any homeowner seeking to enjoin a sale must file a motion and obtain a court order doing so.

By enacting RCW 61.24.127, the legislature made it clear that a borrower cannot bring a claim that affects title to property if they do not first obtain a court order enjoining the nonjudicial foreclosure sale. There is nothing to suggest that the legislature intended to exempt a quiet title action initiated under the Torrens Act from the scope of this waiver provision. We therefore reject the Larsons' contention that the mere filing of a Torrens Act application under Chapter 65.12 RCW somehow automatically precluded Deutsche Bank and QLS from conducting the nonjudicial foreclosure.

The undisputed evidence supports the trial court's conclusion that the Larsons waived their quiet title claim. The Larsons had notice of the nonjudicial foreclosure and did not obtain a court order enjoining the sale, either in the Torrens Act proceeding, which was then pending in Snohomish County Superior Court, or in any other proceeding. The trial court did not err in dismissing the quiet title claims against the Private Defendants.

b.  RCW 64.24.127, the DTA waiver statute, is constitutional

The Larsons next maintain that RCW 61.24.127 cannot constitutionally extinguish their right to pursue a quiet title action. They contend the provision violates the privileges and immunities provision of article I, section 12 of the state constitution. They argue that the statute denies them the right to pursue a common law cause of action against lenders and foreclosure trustees and unconstitutionally confers a special privilege on these entities. We reject this argument.

- 24 -

Washington courts employ a two-part test to decide if legislation violates article I, section 12, asking first if the challenged law grants a "privilege" or "immunity" for purposes of the state constitution, and, if yes, asking if there is a reasonable ground for granting the privilege or immunity. Schroeder v. Weighall, 179 Wn.2d 566, 572-73, 316 P.3d 482 (2014) (citations omitted). "Not every benefit constitutes a 'privilege' or 'immunity' for purposes of the independent article I, section 12 analysis. Rather, the benefits triggering that analysis are only those implicating 'fundamental rights . . . of . . . state . . . citizenship.'" Id. at 573 (quoting State v. Vance, 29 Wash. 435, 458, 70 P. 34 (1902)).[13] In Schroeder, the Supreme Court recognized that "where a cause of action derives from the common law, the ability to pursue it is a privilege of state citizenship triggering article I, section 12's reasonable ground analysis. A law limiting the pursuit of common law claims against certain defendants therefore grants those defendants an article I, section 12 immunity." Id. at 573 (quotations omitted).

RCW 61.24.127 does limit the Larsons' ability to bring a quiet title action after a foreclosure sale, thereby implicating article I, section 12. But RCW 61.24.127 does not bar all quiet title actions; it merely affects the timing of when such claims may be brought—parties must do so in advance of a nonjudicial foreclosure sale. The question is whether the legislature had a reasonable ground

---

[13] The Larsons also argue that Washington courts have recently "eliminated" installment contract statutes of limitations and that this case law violates article 1, section 12. No Washington court has "eliminated" the statute of limitations for installment contracts, as the Larsons suggest. Our Supreme Court held as early as 1945 that "when recovery is sought on an obligation payable by installments the statute of limitations runs against each installment from the time it becomes due." Herzog v. Herzog, 23 Wn.2d 382, 388, 161 P.2d 142 (1945). Our cases merely enforce this black letter contract law. See Merceri v. Bank of New York Mellon, 4 Wn. App. 2d 755, 434 P.3d 84 (2018) (a trustee sale is timely if note has not been accelerated and action is brought within six years of any missed monthly installment payment). This case law does not implicate the privileges and immunities provision of the state constitution.

for limiting quiet title remedies in this manner.

The Larsons rely on two Supreme Court cases holding that statutes limiting the ability of minors to bring medical malpractice claims are unconstitutional under article I, section 12. See Schroeder, 179 Wn.2d at 566; DeYoung v. Providence Med. Ctr., 136 Wn.2d 136, 960 P.2d 919 (1998). In both of those cases, the court concluded that the challenged statutes did not further the legislature's stated objectives of reducing medical malpractice insurance premiums and barring stale claims. Schroeder, 179 Wn.2d at 574-77; DeYoung, 136 Wn.2d at 148.

Unlike Schroeder and DeYoung, however, the timing restriction of RCW 61.24.127 advances the three basic objectives of the DTA by keeping the foreclosure process efficient and inexpensive, retaining the opportunity for a homeowner to prevent a wrongful foreclosure, and promoting the stability of land titles. Bain, 175 Wn.2d at 94. The Larsons do not explain how the ability to bring a quiet title action after a sale has concluded instead of an injunction action to prevent the foreclosure sale from occurring, provides any more protection of their property rights. RCW 61.24.127 is therefore supported by reasonable grounds and does not violate the privileges and immunities clause.[14]

---

[14] The Larsons make a similar argument with respect to the limitations placed on their ability to prosecute claims under the CPA. But they fail to demonstrate that the limitation on a statutory cause of action falls within the scope of article 1, section 12. Generally, rights left to the discretion of the legislature have not been considered fundamental. Martinez-Cuevas v. DeRuyter Bros. Dairy, Inc., 196 Wn.2d 506, 475 P.3d 164 (2020). In Martinez-Cuevas, the Supreme Court held that the statutory right to exempt dairy workers from overtime pay constituted an impermissible privilege or immunity granted to agricultural employers. Id. at 519. But the court's analysis was premised on a constitutional guarantee to workers that "the legislature shall pass necessary laws for the protection of persons working in . . . employments dangerous to life or deleterious to health." Id. (quoting CONST. art. II, § 35). It concluded that "[t]he right to statutory protection for health and safety pursuant to article II, section 35" is a fundamental personal right entitled to protection by the government. Id. at 522. The Larsons have not demonstrated that they have any similar constitutional right, personal to them, affected by RCW 61.24.127. Thus, to the extent the DTA limits their statutory right to recovery under the CPA, it does not implicate article I, section 12.

4. <u>CPA Claims & Constitutional Challenges to the DTA as Against Private Defendants</u>

The Larsons appear also to challenge the summary judgment dismissal of their CPA claims and their constitutional challenges to the DTA. Because the Larsons failed to raise a genuine issue of material fact under the CPA and their challenges to the DTA fail as a matter of law, we affirm dismissal of these claims.

We review a summary judgment order de novo and perform the same inquiry as the trial court. <u>Borton & Sons, Inc. v. Burbank Props., LLC</u>, 196 Wn.2d 199, 205, 471 P.3d 871 (2020). A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." CR 56(c). We view all facts and reasonable inferences in light most favorable to the non-moving party. <u>Owen v. Burlington N. Santa Fe R.R. Co.</u>, 153 Wn.2d 780, 787, 108 P.3d 1220 (2005).

a. <u>CPA Claims</u>[15]

The Larsons contended below that the Private Defendants violated the CPA by conducting a nonjudicial foreclosure sale in violation of the DTA. They argue on appeal that the trial court erred in dismissing their CPA claim because the October 2006 promissory note was not authentic, the MERS's assignment of the deed of trust to Deutsche Bank was invalid, New Century never funded the

---

[15] The Larsons have not assigned error to the dismissal of CPA claims against SPS and QLS. Generally, a party's failure to assign error to or provide argument and citation to authority in support of an assignment of error, as required by RAP 10.3, precludes appellate consideration of an alleged error. <u>Matter of WWS</u>, 14 Wn. App. 2d 342, 350 n.4, 469 P.3d 1190 (2020). In their reply brief, the Larsons contend that QLS violated RCW 65.12.210 by selling the home in a nonjudicial foreclosure without participating in the Larsons' Torrens Act proceeding. They failed to raise this argument below and we will not address any argument raised for the first time in a reply brief. <u>See Ainsworth v. Progressive Cas. Ins. Co.</u>, 180 Wn. App. 52, 78 n.20, 322 P.3d 6 (2014).

Larsons' loan, and New Century breached its contractual obligations to the Larsons by refusing to accept their August 2007 mortgage payment. We reject many of these arguments as frivolous and others as simply not supported by any evidence in this record.

To prevail on a private CPA claim, a plaintiff must establish (1) an unfair or deceptive act or practice; (2) that occurs in trade or commerce; (3) a public interest; (4) injury to the plaintiff; and (5) a causal link between the unfair or deceptive act and the injury suffered. Trujillo v. Nw. Tr. Servs., Inc., 183 Wn.2d 820, 834-35, 355 P.3d 1100 (2015). The failure to establish any of the five elements is fatal to a CPA claim. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 784, 719 P.2d 531 (1986). Violations of the DTA may be actionable under the CPA. Frias v. Asset Foreclosure Srvs., Inc., 181 Wn.2d 412, 430, 334 P.3d 529 (2014).

As to the authenticity of the Larson promissory note, the Larsons contend that Christopher's signature on the note was "misappropriated." Christopher never testified that his signature on the note was forged. Deutsche Bank produced the original promissory note at the summary judgment hearing and demonstrated that the note bears Christopher's signature. In addition, the trial court had copies of the deed of trust bearing both Christopher's and Angela's notarized signatures. When they executed these documents, Christopher also executed a "Name Affidavit," in which he certified that he was the person named in the documents and that his signature was his true and correct signature. This document was also notarized on October 9, 2006, by the same notary public who notarized the deed

of trust. There is no evidence in this record that Christopher's signature on the promissory note was a forgery.

The Larsons argue that under RCW 62A.3-308(a), by denying the validity of the note, they shifted the burden of proving validity to Deutsche Bank.[16] To the extent this statute applies, Deutsche Bank met its burden of proving the validity of the note. The Larsons failed to present any conflicting evidence.

They also cite Stahly v. Emonds, 184 Wash. 207, 210, 50 P.2d 908 (1935), for the proposition that whether a signature has been forged is a question of fact and thus inappropriate for summary judgment. Stahly, however, is distinguishable. The plaintiffs in that case testified "unequivocally" at trial that the signatures on the documents were not theirs. Id. at 210. We have no such testimony here. There is thus no genuine issue of material fact regarding the authenticity of the note.

The Larsons next argue that there is a genuine issue of material fact as to whether New Century and MERS split the deed of trust and promissory note when they named MERS as beneficiary under the deed of trust. They argue that MERS was not an eligible beneficiary of the deed of trust (because it never held the promissory note), and its assignment of the deed of trust to Deutsche Bank had no legal effect unless MERS was New Century's agent and had the authority to assign New Century's rights to Deutsche Bank. If MERS was not acting as New Century's agent at the time of the assignment, the Larsons argue, then Deutsche Bank had no right to conduct a nonjudicial foreclosure under the DTA.

---

[16] RCW 62A.3-308(a) provides: "In an action with respect to an instrument, the authenticity of, and authority to make, each signature on the instrument is admitted unless specifically denied in the pleadings. If the validity of a signature is denied in the pleadings, the burden of establishing validity is on the person claiming validity."

The Larsons rely on <u>Bain</u> for this argument. In <u>Bain</u>, our Supreme Court held that MERS is an ineligible beneficiary under the DTA if it never held the promissory note. 175 Wn.2d at 110. But it cast doubt on the theory that involving MERS automatically constituted a "split" rendering a deed of trust unenforceable. The court stated "While that certainly <u>could</u> happen, given the record before us, we have no evidence that it did. If, for example, MERS is in fact an agent for the holder of the note, likely no split would have happened." <u>Id.</u> at 112. The <u>Bain</u> court also raised a possible second legal option: the creation of an equitable mortgage in favor of the noteholder. <u>Id.</u> at 112-13 (citing the RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 5.4 reporters' note at 386 (1997)).[17]

In <u>Walker v. Quality Loan Service Corp.</u>, 176 Wn. App. 294, 308 P.3d 716 (2013), this court rejected a similar "split the note" theory. In that case, the borrower argued that MERS was never a legitimate beneficiary under RCW 61.24.005 because it did not hold the promissory note and "the interest in the Deed of Trust has been effectively segregated from the interest in the Note," rendering the deed of trust invalid. 176 Wn. App. 294 at 321. This court held that the defect in identifying MERS as the beneficiary did not void the deed of trust and the real beneficiary was the lender or its successors whose interests were secured by the deed of trust. <u>Id.</u> at 323.

---

[17] Under the <u>Restatement (Third) of Property (Mortgages)</u> §5.4 cmt. b (Am. Law Inst. 1997):

> A transfer in full of the obligation automatically transfers the mortgage as well unless the parties agree that the transferor is to retain the mortgage. The objective of this rule . . . is to keep the obligation and the mortgage in the same hands unless the parties wish to separate them.

The Walker court held that the note holder and the beneficiary of a deed of trust securing that note are legally one and the same and the note cannot be "split" from the deed of trust:

> In Bain, the Supreme Court declined to decide the legal effect of MERS acting as an unlawful beneficiary under the DTA. However, the court stated its inclination to agree with MERS's assertion that any violation of the DTA "'should not result in a void deed of trust, both legally and from a public policy standpoint.'" The court also noted, "[I]f in fact MERS is not the beneficiary, then the equities of the situation would likely (though not necessarily in every case) require the court to deem that the real beneficiary is the lender whose interests were secured by the deed of trust or that lender's successors." While dicta, these statements identify critical problems with Walker's argument.

Id. at 322. The court concluded that any defect in the deed of trust through the designation of MERS as beneficiary did not invalidate the deed of trust. Id. Similarly, in Winters v. Quality Loan Service Corp. of Washington, Inc., 11 Wn. App. 2d 628, 644-45, 454 P.3d 896 (2019), this court held that the holder of a promissory note has the authority to enforce the deed of trust because "the deed of trust follows the note by operation of law."[18] We take this opportunity to clearly hold that the designation of MERS as a beneficiary of a deed of trust, even though ineligible to hold that position under the DTA, does not split the promissory note from the deed of trust or invalidate the deed of trust.

It is undisputed that Deutsche Bank holds the Larsons' note and was entitled to enforce the deed of trust. Because Deutsche Bank was not barred from foreclosing on the Larsons' home simply because MERS was listed as the original beneficiary under the deed of trust in 2006, it is immaterial whether MERS was

---

[18] The Ninth Circuit has also held that the split the note theory has no sound basis in law or logic. Cervantes v. Countrywide Home Loans, Inc., 656 F.3d 1034, 1044 (9th Cir. 2011).

acting as New Century's agent or acting on its own behalf when it assigned the deed of trust to Deutsche Bank.

The Larsons next argue that there is a genuine issue of material fact as to whether New Century ever funded the Larsons' loan. We reject this argument because there is absolutely no evidence to support it.[19]

Deutsche Bank provided the trial court with copies of the 2006 closing documents related to New Century's funding of the Larsons' loan. The undisputed evidence shows that New Century funded this loan on October 6, 2006. It authorized the closing escrow company, First American Title, to disburse the funds that same day. First American confirmed it had disbursed the loan proceeds from New Century. The Larsons themselves admit that they closed their loan on October 11, 2006 and used the funds to purchase the property. The record also contains the statutory warranty deed by which the former owners conveyed the property to the Larsons. The Larsons cannot point to a single piece of evidence supporting their allegation that New Century was unable to fully fund their loan.

Finally, the Larsons argue that there is a genuine issue of material fact as to whether New Century breached its contract by refusing to accept their August 2007 mortgage payment. Although somewhat unclear, it appears the Larsons contend that if New Century breached an agreement with them before they defaulted, the Larsons were then released from the obligation to make further payments on the note. But the Larsons cite no legal authority for this proposition

---

[19] The Larsons contend that in 2007, New Century failed to fund a number of loans made to Washington consumers. But even if New Century had insufficient funds to fund loans in 2007, this fact would not prove that it failed to fully fund the Larsons' loan in October 2006.

and it is illogical.

First, the Larsons do not explain how New Century's refusal to accept a payment in August 2007 constituted a material "breach" of any provision of the promissory note. The note contains the Larsons' promise to repay the loan through monthly installment payments on the first day of each month. There is no evidence that New Century declared the Larsons to be in default when they were not in arrears. In fact, according to Angela, New Century informed her in August 2007 that the note had been assigned to someone else. So the only evidence in this record is that New Century no longer held the note when the Larsons claim it refused their payment.

Second, Christopher explicitly acknowledged in the note itself that "the Lender may transfer this Note." New Century indorsed the Larson promissory note in blank. Under the Uniform Commercial Code (UCC), RCW 62A.3-205(b), a note becomes payable to whomever holds the note when it is indorsed in blank. Blair v. Nw. Tr. Srvs, Inc., 193 Wn. App. 18, 32, 372 P.3d 127 (2016). Deutsche Bank presented undisputed testimony that it is the holder of the Larson promissory note and had the legal right to Larsons' installment payments.

Finally, Deutsche Bank did not seek to collect payments prior to March 2012. The final notice of default, dated December 22, 2017, stated that the Larsons' delinquent monthly payments began March 2012. The Larsons do not deny that they failed to make regular payments after that date, or that servicers for Deutsche Bank paid the property's real estate taxes and homeowner's insurance, resulting in over $50,000 in escrow advances on their loan. The Larsons fail to

explain how New Century's alleged breach of contract in 2007 is attributable to Deutsche Bank or any of the other Private Defendants.

The Larsons have failed to establish a genuine issue of material fact on any of their CPA claims against the Private Defendants related to the foreclosure of their home under the DTA. The trial court thus properly dismissed these claims on summary judgment.

b. Constitutional Challenges to the DTA

The Larsons alleged several constitutional challenges to the DTA in the complaint, and the trial court dismissed these arguments on summary judgment. On appeal, their constitutional arguments can be distilled into four claims: (1) the DTA's permissive allowance of nonjudicial foreclosures violates the due process guarantee of a fair hearing, (2) the 2018 amendments to the DTA impaired the contractual relationship between the Larsons and their lender, (3) the DTA treads upon the constitutional original jurisdiction of superior courts, and (4) the DTA's shortened statute of limitations for CPA claims is unconstitutional because it grants unequal privileges and immunities to lenders.[20] We disagree with each of these arguments and affirm their dismissal.

The Larsons first argue that the DTA is unconstitutional because it gives corporate trustees the authority to remove property from mortgagors without due process of law under article I, section 3 of the state constitution. This claim fails for lack of state action.

A violation of the state due process clause requires state action, whether in

---

[20] We rejected the Larsons' constitutional challenge to the limitation of actions contained in RCW 61.24.127 in section 3(b) of this opinion and will therefore not address the issue again here.

civil or criminal context. State v. McCullough, 56 Wn. App. 655, 784 P.2d 566, review denied, 114 Wn.2d 1025 (1990). Our Supreme Court has held that the legislature's passage of the DTA constituted "passive involvement" in private conduct, neither commanding nor forbidding nonjudicial foreclosure, and thus did not constitute state action, as required to support a due process claim. Kennebec, Inc. v. Bank of the West, 88 Wn.2d 718, 722-23, 565 P.2d 812 (1977).

The Larsons distinguish their case from Kennebec on the basis that they "challenge the conduct of the State, . . . the conduct of Snohomish County . . . in intentionally not complying with their duties under [the Torrens Act], the conduct of Judge Svaren, . . . and the Sheriff's threatened eviction of them from their home." But the Larsons' argument blurs their claims against the Public Defendants and their distinct constitutional arguments, arising out of their contract with private parties. They do not allege that the Public Defendants deprived them of due process, but that the DTA and associated mortgage agreements lack adequate procedural protections. State enforcement of a contract between two private parties is not state action. State v. Noah, 103 Wn. App. 29, 50, 9 P.3d 858 (2000).

To the extent the Larsons challenge the actions of the Snohomish County Sheriff in threatening eviction, their claim is similarly unavailing. The mere acquiescence in the actions of a private contracting party is not sufficient to hold the government responsible for those actions under the due process clause of the Fourteenth Amendment to the United States Constitution. Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982) (Medicaid recipients failed to establish state action in nursing home decision to discharge or transfer to lower levels of care). The Larsons failed to allege state action to support their due

process claim.

Even if we were to conclude that nonjudicial foreclosure proceedings under the DTA do constitute state action, the Larsons still have failed to establish a deprivation of due process. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S. Ct. 1187, 1191, 14 L. Ed. 2d 62 (1965)). The level of procedural protection required varies based on circumstance. Id. at 334. Throughout the foreclosure process, the Larsons had open access to the courts and the ability to seek an order enjoining the foreclosure. They chose not to avail themselves of this procedural protection. The Larsons cannot now complain of a lack of procedural protections they expressly declined to use.

Next, the Larsons argue that the Private Defendants could not foreclose in 2018 unless they had the legal authority to do so under the laws in effect at the time the Larsons obtained their loan in 2006. They contend that the state legislature amended RCW 61.24.030(7)(a) in 2018 to permit a note holder who is not the "owner" of the deed of trust to foreclose, but this amendment cannot apply retroactively to the Larsons' deed of trust without impairing the Larsons' contract rights.[21]

---

[21] RCW 61.24.030(7)(a) requires a trustee, before recording a notice of trustee's sale, to receive proof that the beneficiary under the deed of trust is the holder of the promissory note secured by the deed of trust. A declaration from the beneficiary, made under penalty of perjury, stating that the beneficiary is the holder of the note "shall be sufficient proof as required under this subsection."

Article I, section 23 of the Washington Constitution prohibits the legislature from passing a law "impairing the obligations of contracts." Wash. Educ. Ass'n v. Dep't Ret. Svcs., 181 Wn.2d 233, 242, 332 P.3d 439 (2014). But the prohibition against the impairment of contracts is not absolute and cannot be read with "literal exactness." Wash. Fed. of State Emps v. State, 127 Wn.2d 544, 560, 901 P.2d 1028 (1995). When the legislature impairs contract rights between private parties, courts defer to legislative judgment to determine if it was reasonably necessary. Hous. Auth. of Sunnyside, Wash. v. Sunnyside Valley Irr. Dist., 51 Wn. App. 387, 393, 753 P.2d 1005, 1009 (1988), rev'd on other grounds sub nom. Hous. Auth. of Sunnyside v. Sunnyside Valley Irr. Dist., 112 Wn. 2d 262, 772 P.2d 473 (1989). In determining whether a law violates the contracts clause, a court will determine if state law has operated to substantially impair a contractual relationship, measured by the degree of destruction of the contractual expectation. Id. (citing Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 103 S. Ct. 697, 74 L. Ed. 2d 569 (1983)). If so, the state must have a significant and legitimate public purpose for the regulation such as the remedying of a broad and general social or economic problem. Id.

The Larsons fail to explain how the passage of RCW 61.24.030(7)(a) substantially impaired their contractual relationship with their lender. It appears that their argument is premised on the erroneous assumption that New Century and MERS "split" the note from the deed of trust, a legal argument we have rejected. And we do not understand how permitting a note holder, such as Deutsche Bank, to enforce the deed of trust significantly modified any contract rights the Larsons had when they obtained their home loan in 2006.

We also reject the Larsons' assertion that nonjudicial foreclosure sales violate article IV, section 6 of the state constitution by infringing upon the original jurisdiction on the superior courts. Article IV, section 6 provides that "[t]he superior court shall have original jurisdiction in all cases at law which involve the title or possession of real property." In Jackson v. Quality Loan Serv. Corp., 186 Wn. App. 838, 347 P.3d 487 (2015), the plaintiff made the same argument that the Larsons do here: that the DTA is unconstitutional for giving nongovernmental actors the authority to determine the result of contractual cases at law which involve the title and possession of real property, when the exclusive jurisdiction over such matters is bestowed by article IV, section 6 with the superior courts. The Jackson court disagreed, reasoning

> a nonjudicial foreclosure is not made pursuant to a judgment but rather is one conducted under a power contained in a mortgage or a decree of foreclosure. As such, it is made through an agreement between the grantor and the beneficiary of the deed of trust. The DTA does not divest the superior court of jurisdiction. Indeed, the superior court's constitutional grant of jurisdiction is preserved in specific portions of the DTA. Until a party challenges the foreclosure, there is no judicial involvement. It is at that point that the superior's court's jurisdiction is invoked.

Jackson, 186 Wn. App. at 847-48.

The Larsons argue that Jackson is not controlling because its constitutional analysis was mere dicta and conflicts with other precedents holding that the legislature may not enact legislation intended to frustrate the jurisdiction of the superior courts. The Larsons correctly note that the Jackson court rejected the borrowers' constitutional challenge based on their failure to notify the state attorney general of their challenge, as required by RCW 7.24.110. 186 Wn. App. at 846.

Its discussion about the legislature's authority to enact the DTA is thus dicta. But Jackson's constitutional analysis is well-reasoned and we adopt it here.

A superior court has subject matter jurisdiction "where it has authority to adjudicate the type of controversy involved in the action." Boudreaux, 10 Wn. App. 2d at 295(quoting In re McDermott, 175 Wn. App. 467 at 480-81). As the Jackson court explained, a nonjudicial foreclosure is conducted under a specific contractual agreement made between the borrower and the beneficiary of the deed of trust. 186 Wn. App. at 847. The DTA preserves the superior court's jurisdiction by giving a borrower the right to file an action in superior court to restrain the sale, RCW 61.24.130(1), granting the borrower the power to initiate court action, RCW 61.24.040(2), and granting the borrower the right to request a court to decide the reasonableness of fees a lender demands before reinstating the mortgage. RCW 61.24.090(2). We conclude that the legislature had the authority to enact the DTA and its enactment does not encroach on the jurisdiction of the superior court. Summary judgment as to this claim was appropriate.

5. Order Dismissing Torrens Act Proceeding

In August 2020, the Snohomish County Superior Court dismissed the Larsons' Torrens Act application on the basis that, after the nonjudicial foreclosure sale, they were no longer the owners of the property and lacked any interest in the land to be registered. We affirm this conclusion.

The Torrens Act provides that "[t]he owner of any estate or interest in land, whether legal or equitable, except unpatented land, may apply as hereinafter provided to have the title of said land registered." RCW 65.12.005. Homeowners who have lost their home in a foreclosure sale are no longer owners of the property

and lack standing to prosecute a title registration action. Matter of Warren, 10 Wn. App. 2d 596, 599, 448 P.3d 820 (2019). Once the Larsons lost title in the property in the November 2018 foreclosure sale, they had no statutory right to pursue title registration. The trial court properly dismissed their Torrens Act application.

6. Denial of Motion to Amend

The Larsons next argue that the trial court erred in denying their motion to amend their complaint to reallege claims against the Public Defendants and to add additional State office holders or entities. They contend they had no other way to obtain a ruling that Snohomish County and its officials were intentionally not complying with the Torrens Act. We disagree—the Larsons could have remedied the defect in their Torrens Act petition by filing and recording the abstract of title, as the superior court ruled when dismissing the claims.

We review the denial of a motion to amend a complaint under a manifest abuse of discretion standard. McDonald v. State Farm Fire and Cas. Co., 119 Wn.2d 724, 737, 837 P.2d 1000 (1992). Leave to amend "shall be freely given when justice so requires." CR 15(a). However, a trial court may consider whether the new claim is futile. Ino Ino, Inc. v. City of Bellevue, 132 Wn.2d 103, 142, 937 P.2d 154 (1997).

The trial court did not abuse its discretion in concluding that the Larsons' proposed amendment would be futile. At oral argument, the trial court recognized, and the Larsons do not dispute, that the proposed amended complaint contained "the same basic claims, based upon the same basic facts." The only apparent difference was the addition of a claim for damages against both Public and Private Defendants for violations of the Torrens Act. The gravamen of the Larsons'

- 40 -

argument was, once again, that the trial court lacked subject matter jurisdiction to decide whether their application was defective.   Under these circumstances, the trial court did not abuse its discretion in denying the motion to amend.

   7.  Recusal

The Larsons next argue that both Judge Svaren and Judge Okrent had an interest in the outcome of their respective cases and thus erred by failing to recuse themselves.  We disagree.

This court reviews a trial judge's recusal decision for abuse of discretion. State v. Gentry, 183 Wn.2d 749, 761, 356 P.3d 714 (2015).  A judicial officer "shall not act as such in a court of which he or she is a member in any . . . action, suit, or proceeding to which he or she is a party, or in which he or she is directly interested."   RCW 2.28.030.  "Due process, appearance of fairness and Canon 3(D)(1) of the Code of Judicial Conduct require a judge to recuse himself where there is bias against a party or where impartiality can be questioned."   State v. Leon, 133 Wn. App. 810, 812, 138 P.3d 159 (2006).

> A mere suspicion of partiality may be enough to warrant recusal because the effect on the public's confidence in our judicial system can be debilitating. The test for determining whether a judge's impartiality might reasonably be questioned is an objective test that assumes that a reasonable person knows and understands all the relevant facts.

Gentry, 183 Wn.2d at 762 (citations omitted).

The Larsons argue that Judge Svaren, and every other Skagit County Superior Court judge, should have been precluded from hearing their case because "judges and other public servants have been unconstitutionally incentivized to approve foreclosures outside of equity" due to the fact that judges'

- 41 -

state retirement funds are invested in mortgage-backed securities. They further argue that Judge Okrent and the Snohomish County judges cannot be considered impartial because (1) their retirement accounts are invested in mortgage backed securities, and (2) they have historically failed to comply with their duties under the Torrens Act. The Larsons offer documents from the Washington State Investment Board to support its allegation. These arguments are unconvincing for several reasons.

First, the Larsons appear to argue that there is no judge in either county who could adjudicate their cases. If true, the rule of necessity defeats their argument. The rule of necessity is "a well-settled principle at common law that . . . 'although a judge had better not, if it can be avoided, take part in the decision of a case in which he has any personal interest, yet he not only may but must do so if the case cannot be heard otherwise.'" U.S. v. Will, 449 U.S. 200, 213, 101 S. Ct. 471, 66 L. Ed. 2d 392 (1980) (quoting F. POLLACK, A FIRST BOOK OF JURISPRUDENCE 270 (6th ed. 1929)). The rule "provides for the effective administration of justice while preventing litigants from using the rules of recusal to destroy what may be the only tribunal with power to hear a dispute." Glick v. Edwards, 803 F.3d 505, 509 (9th Cir. 2015). Because the Larsons sought the disqualification of every judge in both counties where they elected to bring their cases, the recusal of Judge Svaren and Judge Okrent was not required.

Second, the Larsons failed to establish any personal connection between Judge Svaren or Judge Okrent and their cases. CJC Canon 3(D) lays out the rules for when judges should disqualify themselves in a proceeding, for example, when the judge has a personal bias or prejudice concerning a party, when the judge

previously served as a lawyer or witness in a controversy, or when the judge's family member is or is likely to be a witness in the case.  None of these situations occurred here.

The Larsons' allegation that judges have a personal interest in retirement funds invested in mortgage-backed securities and therefore have some interest in allowing lenders to foreclose is pure speculation.  The Larsons have alleged no facts indicating that either judge has control over the state retirement plans or that their decisions regarding the Torrens Act will have any impact whatsoever on the value of securities in which the retirement plans are invested.  Without these facts, there is nothing to support the Larsons' argument.

Their allegation that Judge Svaren could not rule impartially on a case in which a party alleges that judges in Snohomish County were violating the Torrens Act is similarly unsupported in this record.  And by the time Judge Okrent dismissed the Larsons' Torrens Act petition, the County had rectified the procedural issues the Larsons had raised in their Skagit County lawsuit.[22]  The only issue before Judge Okrent was whether the Larsons could continue to pursue title registration after they lost their home in a foreclosure sale.  No reasonable person could conclude that either Judge Svaren or Judge Okrent acted in any way other than impartially in handling these cases.

8.  Transfer of Venue

The Larsons finally argue that trial court erred in transferring venue to Snohomish County Superior Court.   The Larsons argue that RCW 4.12.030

---

[22] According to the Larsons, Snohomish County appointed an examiner of titles in 2019.

requires that venue should have remained with Skagit County Superior Court. We disagree.

Venue is governed primarily by statute. Ralph v. Weyerhaeuser Co., 187 Wn.2d 326, 338, 386 P.3d 721 (2016). While as a general rule the initial choice of venue lies with the plaintiff, the plaintiff must choose a venue that is statutorily authorized. Id. If a plaintiff files in an improper venue and the defendant does not waive the objection, the defendant has the right to have the matter transferred to a proper venue. RCW 4.12.030(1). Changing venue under such circumstances is not discretionary and is reviewed as a matter of law. Ralph, 187 Wn.2d at 338.

Actions relating to the title of real property must be brought in the county in which the real estate is situated. RCW 4.12.010(1). The Larsons' complaint against the Private Defendants was an action relating to the title of real property because they alleged these defendants had no valid encumbrance on their property and thus no legal right to conduct a foreclosure sale under various legal theories. Their lawsuit was an action relating to title of real property. The trial court correctly concluded a change of venue was legally required under this statute.

The Larsons, however, argue that they were entitled to remain in Skagit County Superior Court under RCW 4.12.030(2). Under RCW 4.12.030(2), a court has the discretion to change venue when, among other reasons, "there is a reason to believe that an impartial trial cannot be had therein." We review a venue decision under this section for abuse of discretion. Unger v. Cauchon, 118 Wn. App. 165, 170, 73 P.3d 1005 (2003). The Larsons argue that an impartial trial could not be held in Snohomish County because all of the Snohomish County Superior Court judges had recused themselves from the case. But this issue was

resolved by appointing Judge Svaren to sit as a visiting judge in Snohomish County Superior Court. None of the recused judges ruled on the Larsons' cases. The trial court's refusal to set venue in Skagit County Superior Court under RCW 4.12.030(2) was not an abuse of discretion.

9. Attorney Fees

Deutsche Bank requests attorney fees on appeal under RAP 18.1, relying on paragraph 26 of the deed of trust. This provision provides:

> Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument. The term "attorneys' fees," whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

A lender can recover attorney fees on appeal when the deed of trust allows them to do so. Edmundson v. Bank of Am., 194 Wn. App. 920, 933, 378 P.3d 272 (2016). The Larsons' complaint sought to invalidate the deed of trust; Deutsche Bank had to participate in the lawsuit to enforce its terms. For this reason, the proceeding involved the construction and enforcement of the deed of trust, entitling Deutsch Bank to an award of attorney fees on appeal. We therefore award attorney fees to Deutsche Bank conditioned on its compliance with RAP 18.1(d).

Affirmed.

_Andrus, A.C.J._

WE CONCUR:

- 45 -